2022-CC10457

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

## IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
## STATE OF MISSOURI

MELINDA DAY as Wrongful Death Heir and Personal
Representative of the Estate of ERNEST EVANS,
JUSTIN FAIRHURST, FREDA FARRAR, MARK
FARRELL, MARY FEDERICO as Wrongful Death
Heir and Personal Representative of the Estate of
LOUIS FEDERICO, STEVEN FEOLA, MARK
FIELDS, WILLIE FISHER, SHAWREIKA FISHER,
KEVIN FISTER, RONALD FITE, JANA
FITZGERALD as Wrongful Death Heir and Personal
Representative of the Estate of MARK FITZGERALD,
LINDA PEEVYHOUSE as Wrongful Death Heir and
Personal Representative of the Estate of JONATHON
FORD, DUANE FRANTUM, THERESA FRASER,
ALAN FREY, JANEVA FRISBY, STEVEN
FROSTAD, JANIS FRYE as Wrongful Death Heir and
Personal Representative of the Estate of RICHARD
WAYNE FRYE SR., LYNNA FULTON, WARREN
GAMBLE, LINDA WRIGHT as Wrongful Death Heir
and Personal Representative of the Estate of MINNIE
GAMBLE, EVAN GAMSU, JAMES GARDENHIRE,
GEORGE GARDINER, JOSEPH GARDNER, DENNIS
GARETANO, JOHN GARGAN, RODGER GARRETT,
ROBERT GARRETT JR., JAMES GARRITY, DAVID
GASKINS, STEFANIE GATES, PHILLIP GEORGE,
PATRICIA GIEFER as Wrongful Death Heir and
Personal Representative of the Estate of HERBERT
GIEFER, JENNIFER GILBERT, DWAIN
GLASCOCK, JIMMY GOFF, TINA NEUMANN as
Wrongful Death Heir and Personal Representative of the
Estate of  LINDA GOLDEN, KARRIE GONZALES,
JOSE GONZALEZ, BRENDA GONZALEZ,
MICHAEL GONZALEZ, JEANNE GORDON,
KENNETH GOSCILA, FREDERICK GRAFF,
THOMAS GREEN, RICHARD GREENDONNER,
ANGELA LAWLER as Wrongful Death Heir and
Personal Representative of the Estate of HARRY
GRIFFIN, DAVID GRIGSBY,  JOHNATHON
GRISGBY CROSS, MARY GROVES, PAUL
GUARDADO, MICHAEL HADAM, ROBERT
HADDEN, INA HALL, CINDY HAMILTON, DAVID
HAMILTON,  HANNAH HAMMOND as Wrongful
Death Heir and Personal Representative of the Estate of
LARRY HAMMOND, MATT HANDRAHAN,

**Case No.**_____

**JURY TRIAL DEMANDED**

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

ROBERT HANSEK,  JONATHAN SETTLE as
Wrongful Death Heir and Personal Representative of the
Estate of JUDITH HANSON, ANTHONY HARBIN,
WILLIAM HARMAN, BRUCE HARR, JAMES
HARRISON,  KAREN HARRISON as Wrongful Death
Heir and Personal Representative of the Estate of
LYNDON HARRISON,  BRENDA HARVEY as
Wrongful Death Heir and Personal Representative of the
Estate of EDWARD HARVEY, LYNDA HASS,
DONNA HAWES, DONALD HAWORTH, CANDACE
HEE,  CASSANDRA DEVEREAUX as Wrongful
Death Heir and Personal Representative of the Estate of
DAVID HENDERSON DEVEREAUX, WILLIAM
HERNACKI, ROBIN HERRERA as Wrongful Death
Heir and Personal Representative of the Estate of
ALFONSO HERRERA, ANTHONY HICKS,  DENISE
GAFFNEY as Wrongful Death Heir and Personal
Representative of the Estate of NATHAN
HIGGINBOTHAM, RONALD HILKER, BRIAN HILL,
HELEN HINES,  MICK HOGAN as Wrongful Death
Heir and Personal Representative of the Estate of TODD
HOGAN, WILLIAM HOLLYFIELD,  LANISHA
GAMBLES as Wrongful Death Heir and Personal
Representative of the Estate of TYRONNE HOLMES,
STELLA HOMICKI,  DIANN HORNE as Wrongful
Death Heir and Personal Representative of the Estate of
JOSIE HORNE, PRINCE HOUSTON, AMANDA
HUEMILLER, JORGE HUERTA FLORES,
CHRISTOPHER HUMPHREY, and  SHAWN MCNEA
as Wrongful Death Heir and Personal Representative of
the Estate of CONSTANCE HUNDLEY,

        *Plaintiffs*,

v.

MONSANTO COMPANY
Serve:  Registered Agent
        CSC of St. Louis County, Inc.
        MC – CSC1
        9666 Olive Blvd., Suite 690
        St. Louis, MO 63132-3026

        *Defendant*.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

## PETITION

COME NOW Plaintiffs, Melinda Day as Wrongful Death Heir and Personal Representative of the Estate of Ernest Evans, Justin Fairhurst, Freda Farrar, Mark Farrell, Mary Federico as Wrongful Death Heir and Personal Representative of the Estate of Louis Federico, Steven Feola, Mark Fields, Willie Fisher, Shawreika Fisher, Kevin Fister, Ronald Fite, Jana Fitzgerald as Wrongful Death Heir and Personal Representative of the Estate of Mark Fitzgerald, Linda Peevyhouse as Wrongful Death Heir and Personal Representative of the Estate of Jonathon Ford, Duane Frantum, Theresa Fraser, Alan Frey, Janeva Frisby, Steven Frostad, Janis Frye as Wrongful Death Heir and Personal Representative of the Estate of Richard Wayne Frye Sr., Lynna Fulton, Warren Gamble, Linda Wright as Wrongful Death Heir and Personal Representative of the Estate of Minnie Gamble, Evan Gamsu, James Gardenhire, George Gardiner, Joseph Gardner, Dennis Garetano, John Gargan, Rodger Garrett, Robert Garrett Jr., James Garrity, David Gaskins, Stefanie Gates, Phillip George, Patricia Giefer as Wrongful Death Heir and Personal Representative of the Estate of Herbert Giefer, Jennifer Gilbert, Dwain Glascock, Jimmy Goff, Tina Neumann as Wrongful Death Heir and Personal Representative of the Estate of Linda Golden, Karrie Gonzales, Jose Gonzalez, Brenda Gonzalez, Michael Gonzalez, Jeanne Gordon, Kenneth Goscila, Frederick Graff, Thomas Green, Richard Greendonner, Angela Lawler as Wrongful Death Heir and Personal Representative of the Estate of Harry Griffin, David Grigsby, Johnathon Grigsby Cross, Mary Groves, Paul Guardado, Michael Hadam, Robert Hadden, Ina Hall, Cindy Hamilton, David Hamilton, Hannah Hammond as Wrongful Death Heir and Personal Representative of the Estate of Larry Hammond, Matt Handrahan, Robert Hansek, Jonathan Settle as Wrongful Death Heir and Personal Representative of the Estate of Judith Hanson, Anthony Harbin, William Harman, Bruce Harr, James Harrison, Karen Harrison as Wrongful Death Heir and Personal Representative of the

3

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

Estate of Lyndon Harrison, Brenda Harvey as Wrongful Death Heir and Personal Representative of the Estate of Edward Harvey, Lynda Hass, Donna Hawes, Donald Haworth, Candace Hee, Cassandra Devereaux as Wrongful Death Heir and Personal Representative of the Estate of David Henderson Devereaux, William Hernacki, Robin Herrera as Wrongful Death Heir and Personal Representative of the Estate of Alfonso Herrera, Anthony Hicks, Denise Gaffney as Wrongful Death Heir and Personal Representative of the Estate of Nathan Higginbotham, Ronald Hilker, Brian Hill, Helen Hines, Mick Hogan as Wrongful Death Heir and Personal Representative of the Estate of Todd Hogan, William Hollyfield, Lanisha Gambles as Wrongful Death Heir and Personal Representative of the Estate of Tyronne Holmes, Stella Homicki, Diann Horne as Wrongful Death Heir and Personal Representative of the Estate of Josie Horne, Prince Houston, Amanda Huemiller, Jorge Huerta Flores, Christopher Humphrey and Shawn McNea as Wrongful Death Heir and Personal Representative of the Estate of Constance Hundley, and for their causes of action against Defendant Monsanto Company, alleging the following upon information and belief (including investigation made by and through Plaintiffs' counsel), except those allegations that pertain to Plaintiffs, which are based on personal knowledge:

### INTRODUCTION

Plaintiffs bring this cause of action against Defendant pursuant to Rule 52.05(a) of the Missouri Rules of Civil Procedure, as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact. All claims in this action are a direct and proximate result of Defendant's negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). All Plaintiffs in this action seek recovery for damages as a result of developing Non-

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma, and/or Leukemia, directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup, and its active ingredient, glyphosate, and the attendant effects of developing diseases. No Plaintiff knew of an association between exposure to Roundup and the increased risk of developing these diseases until well after the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of glyphosate. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup.

## I.    THE PARTIES

### Plaintiffs

1.    Plaintiff Melinda Day as Wrongful Death Heir and Personal Representative of the Estate of Ernest Evans, deceased, and lives in Smiths Station, Alabama. She is the next of kin and Personal Representative of the Estate of Ernest Evans, an Alabama Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses. He used and/or was exposed to Roundup approximately 19 years. He was diagnosed with non-Hodgkins Lymphoma on or about April 13, 2018 as a result of exposure to Roundup and died of his injuries on October 19, 2019.

2.    Plaintiff Justin Fairhurst is a resident of Staten Island, New Jersey. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and for maintenance purposes while working as a contractor. He used and/or was exposed to Roundup approximately from 1998 and 2019. On or about August 20, 2020 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

3.      Plaintiff Freda Farrar is a resident of Panama, Oklahoma. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from at least 2005 and 2015. On or about August 1, 2015 she was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

4.      Plaintiff Mark Farrell is a resident of Indialantic, Florida. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. He used and/or was exposed to Roundup from approximately 1992 until 1997. On or about September 8, 2004 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

5.      Plaintiff Mary Federico as Wrongful Death Heir and Personal Representative of the Estate of Louis Federico, deceased, and lives in Woodbridge, Connecticut. She is the next of kin and Personal Representative of the Estate of Louis Federico, a Connecticut Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while owning an operating a paving company. He used and/or was exposed to Roundup approximately from 1993 to 2015. He was diagnosed with non-Hodgkins Lymphoma on or about June 2017 as a result of exposure to Roundup and died of his injuries on May 14, 2019.

6.      Plaintiff Steven Feola is a resident of Ocean Township, New Jersey. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from at least 1988 to 2018. On or about June 2003 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

7.      Plaintiff Mark Fields is a resident of Litchfield Park, Arizona. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

("Roundup") for personal uses. He used and/or was exposed to Roundup approximately from 1998 to 2004. On or about July 1, 2003 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

8.      Plaintiff Willie Fisher is a resident of Orange, Texas. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and during the course of his employment as a farm hand from at least 1988 to 2016. On or about January 7, 2016 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

9.      Plaintiff Shawreika Fisher is a resident of Ruther Glen, Virginia. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses approximately between 2019 and 2020. She was diagnosed with non-Hodgkins Lymphoma on or about July 24, 2020 as a result of exposure to Roundup.

10.     Plaintiff Kevin Fister is a resident of Palm City, Florida. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. He was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

11.     Plaintiff Ronald Fite is a resident of Oklahoma City, Oklahoma. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and/or other uses in between 1973 and 1999. On or about October 1995 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

12.     Plaintiff Jana Fitzgerald as Wrongful Death Heir and Personal Representative of the Estate of Mark Fitzgerald, deceased, and lives in Chicago, Illinois. She is the next of kin and Personal Representative of the Estate of Mark Fitzgerald, an Illinois Estate. Decedent was exposed

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and/or other uses. He used and/or was exposed to Roundup approximately between 2006 and 2013. He was diagnosed with non-Hodgkins Lymphoma on or about March 2009 as a result of exposure to Roundup and died of his injuries on February 24, 2014.

13.     Plaintiff Linda Peevyhouse as Wrongful Death Heir and Personal Representative of the Estate of Jonathon Ford, deceased, and lives in Meridian, Mississippi. She is the next of kin and Personal Representative of the Estate of Jonathon Ford, a Mississippi Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and/or other uses. He used and/or was exposed to Roundup approximately between 1992 and 2005. He was diagnosed with non-Hodgkins Lymphoma on or about 2008 as a result of exposure to Roundup and died of his injuries on January 27, 2018.

14.     Plaintiff Duane Frantum is a resident of Dundalk, Maryland. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses from at least 1990 through 1996. He was diagnosed with non-Hodgkin's Lymphoma on or about January 2016. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

15.     Plaintiff Theresa Fraser is a resident of Spring Hill, Florida. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses approximately from 2008 and 2012. She was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup on or about January 2011. She developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

16.     Plaintiff Alan Frey is a resident of Menasha, Wisconsin. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. He used and/or was exposed to Roundup in between 1987 to 2020. On or about May 1, 2020 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

17.     Plaintiff Janeva Frisby is a resident of Prunedale, California. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while being employed as a farmer. She used and/or was exposed to Roundup from approximately 1995 to 2013. On or about December 2014 she was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

18.     Plaintiff Steven Frostad is a resident of Herndon, Virginia. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from at least 1991 through 2020. He was diagnosed with non-Hodgkin's Lymphoma on or about February 2020 as a result of Roundup exposure.

19.     Plaintiff Janis Frye as Wrongful Death Heir and Personal Representative of the Estate of Richard Wayne Frye Sr., deceased, and lives in Broken Arrow, Oklahoma. She is the next of kin and Personal Representative of the Estate of Richard Wayne Frye Sr., an Oklahoma Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses. He used and/or was exposed to Roundup approximately between 1992 and 2017. He was diagnosed with non-Hodgkins Lymphoma on or about January 2006 as a result of exposure to Roundup and died of his injuries on August 3, 2008.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

20.     Plaintiff Lynna Fulton is a resident of Fort Worth, Texas. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses approximately from 1980 and 1995. On or about 2000 she was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

21.     Plaintiff Warren Gamble is a resident of Casper, Wyoming He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from at least 1986 through 2020. He was diagnosed with non-Hodgkin's Lymphoma on or about November 6, 2019. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

22.     Plaintiff Linda Wright as Wrongful Death Heir and Personal Representative of the Estate of Minnie Gamble, deceased, and lives in Eustis, Florida. She is the next of kin and Personal Representative of the Estate of Minnie Gamble, a Florida Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from at least 1991 to 2018. She was diagnosed with non-Hodgkins Lymphoma on or about July 2018 as a result of exposure to Roundup and died of her injuries on August 27, 2018

23.     Plaintiff Evan Gamsu is a resident of Prairie Village, Kansas. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and/or other uses approximately from 2006 and 2016. He was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup on or about January 1, 2010. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

24.     Plaintiff James Gardenhire is a resident of Shreveport, Louisiana. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

("Roundup") for personal and/or other uses. He used and/or was exposed to Roundup from approximately January 2010 until April 2011. On or about October 2011 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

25.     Plaintiff George Gardiner is a resident of Maurice, Louisiana. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while being employed as a farmer. He used and/or was exposed to Roundup from approximately 1979 until 2020. On or about January 1, 2018 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

26.     Plaintiff Joseph Gardner is a resident of Acton, California. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. He was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

27.     Plaintiff Dennis Garetano is a resident of Huntington Station, New York. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. On or about June 2020 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

28.     Plaintiff John Gargan is a resident of New York, New York. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses in the residence from approximately 1998 and 2005. He was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup on or about May 2006.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

29.     Plaintiff Rodger Garrett is a resident of Kyle, Texas. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while being employed as a maintenance worker. He used and/or was exposed to Roundup from approximately 1990 to 2018. On or about January 2010 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

30.     Plaintiff Robert Garrett Jr. is a resident of Paterson, New Jersey. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while being employed as a landscaper from at least 1990 and 2013. On or about June 2012 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

31.     Plaintiff James Garrity is a resident of Phelan, California. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses at her residence. He used and/or was exposed to Roundup approximately from 1996 to 2001. On or about September 1, 2013 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

32.     Plaintiff David Gaskins is a resident of Bonneau, South Carolina. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from at least 1998 and 2018. On or about February 26, 2020 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

33.     Plaintiff Stefanie Gates is a resident of Oxnard, California. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses from at least 2000 through 2015. On or about 2002 she was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

34.     Plaintiff Phillip George is a resident of Millington, Tennessee. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") while being employed as a Flight Engineer from approximately 1974 and 1993. He was diagnosed with non-Hodgkins Lymphoma on or about July 5, 2015. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

35.     Plaintiff Patricia Giefer as Wrongful Death Heir and Personal Representative of the Estate of Herbert Giefer, deceased, and lives in Golden, Colorado. She is the next of kin and Personal Representative of the Estate of Herbert Giefer, a Colorado Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/ or other uses from approximately 1998 to 2017. He was diagnosed with non-Hodgkins Lymphoma on or about August 20, 2017 as a result of exposure to Roundup and died of his injuries on November 21, 2017.

36.     Plaintiff Jennifer Gilbert is a resident of Camarillo, California. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses from approximately 2012 and 2017. She was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup on or about August 2017

37.     Plaintiff Dwain Glascock is a resident of Eldorado, Illinois. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses at his residence and for maintenance purposes on the premises of his rental properties. He used and/or was exposed to Roundup from approximately 1982 and 2020. On or about January 1996 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

38.    Plaintiff Jimmy Goff is a resident of Hanford, California. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses in between at least 1992 and 2020. He was diagnosed with non-Hodgkins Lymphoma on or about January 2012. He developed non-Hodgkins Lymphoma as a result of exposure to Roundup.

39.     Plaintiff Tina Neumann as Wrongful Death Heir and Personal Representative of the Estate of Linda Golden, deceased, and lives in Tucson, Arizona. She is the next of kin and Personal Representative of the Estate of Linda Golden, an Arizona Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while being employed as a housekeeper. She used and/or was exposed to Roundup from approximately 1990 and 2019. She was diagnosed with non-Hodgkins Lymphoma in June 2019 as a result of exposure to Roundup and died of her injuries on March 19, 2020.

40.    Plaintiff Karrie Gonzales is a resident of Davis, California. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from approximately 1999 and 2020. She was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup on or about May 2020. She developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

41.    Plaintiff Jose Gonzalez is a resident of Cleveland, Ohio. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from approximately 2012 and 2018. He was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup on or about July 1, 2017. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

42.     Plaintiff Brenda Gonzalez is a resident of Rumsey, California. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from approximately 2001 and 2019. She was diagnosed with non-Hodgkins Lymphoma on or about December 1, 2019. She developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

43.     Plaintiff Michael Gonzalez is a resident of Mineola, Texas. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") while being employed as a maintenance worker from approximately 1995 and 1998. He was diagnosed with non-Hodgkins Lymphoma on or about January 1999. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

44.     Plaintiff Jeanne Gordon is a resident of Palm Harbor, Florida. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from approximately 2005 and 2009.  She was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup on or about 2009. She developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

45.     Plaintiff Kenneth Goscila is a resident of Lowell, Massachusetts. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses at his residence. He used and/or was exposed to Roundup from approximately 1990 and 2016. In January 2017 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

46.     Plaintiff Frederick Graff is a resident of Lake Havasu, Arizona. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses. He used and/or was exposed to Roundup from at least 1974 to

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

2018. He was diagnosed with non-Hodgkins Lymphoma on or about August 2005. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

47.     Plaintiff Thomas Green is a resident of Port Charlotte, Florida. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") while being employed as a maintenance worker and a groundskeeper. He used and/or was exposed to Roundup approximately 1980 and 2010. On or about October 2017 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

48.     Plaintiff Richard Greendonner is a resident of Bradenton, Florida. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. He used and/or was exposed to Roundup approximately from 1982 to 2019. On or about April 2017 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

49.     Plaintiff Angela Lawler as Wrongful Death Heir and Personal Representative of the Estate of Harry Griffin, deceased, and lives in San Antonio, Texas. She is the next of kin and Personal Representative of the Estate of Harry Griffin, a Texas Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/ or other uses from at least 1995 to 2016. On or about January 2006 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of his injuries on November 12, 2019.

50.     Plaintiff David Grigsby is a resident of Junction City, Ohio. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses at his residence and while working as a landscaper. He used and/or

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

was exposed to Roundup approximately from 1990 to January 2020. On or about September 24, 2020 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

51.     Plaintiff Johnathon Grigsby Cross is a resident of Kingsley, Iowa. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses approximately from 1975 through 2015. He was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup on or about October 2012.

52.     Plaintiff Mary Groves is a resident of Indianapolis, Indiana. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses. She used and/or was exposed to Roundup from at least 2005 to 2018. She was diagnosed with non-Hodgkins Lymphoma on or about August 26, 2020. She developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

53.     Plaintiff Paul Guardado is a resident of Massilon, Ohio. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses. He used and/or was exposed to Roundup from at least 2000 to 2019. He was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup on or about August 2017.

54.     Plaintiff Michael Hadam is a resident of Tallmadge, Ohio. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses. He used and/or was exposed to Roundup from at least 1999 to 2014. He was diagnosed with non-Hodgkins Lymphoma on or about August 25, 2011. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

55.     Plaintiff Robert Hadden is a resident of Chesapeake City, Maryland. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

products ("Roundup") for personal uses and while being employed as a maintenance worker. He used and/or was exposed to Roundup approximately from 1989 and 2019. He was diagnosed with non-Hodgkins Lymphoma on or about January 1, 2019. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

56.    Plaintiff Ina Hall is a resident Prestonsburg, Kentucky. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses. She used and/or was exposed to Roundup from at least 1974 to 2019. On or about May 2020 she was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

57.    Plaintiff Cindy Hamilton is a resident of Waianae, Hawaii. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from approximately 2010 and 2014. On or about September 2014 she was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

58.    Plaintiff David Hamilton is a resident of Magnolia, Misssissippi. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for residential use in between 1985 and 2017. On or about July 2014 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

59.    Plaintiff Hannah Hammond as Wrongful Death Heir and Personal Representative of the Estate of Larry Hammond, deceased, and lives in Warsaw, Kentucky. She is the next of kin and Personal Representative of the Estate of Larry Hammond, a Kentucky Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses from at least 2008 to 2018. On or about

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

January 2015 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of his injuries on February 25, 2018.

60.     Plaintiff Matt Handrahan is a resident of Pompano Beach, Florida. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses. He used and/or was exposed to Roundup from at least 1996 to 2020. On or about 2016 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

61.     Plaintiff Robert Hansek is a resident of Winston, Georgia. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. He used and/or was exposed to Roundup from at least 2011 to 2018. On or about August 2018 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

62.     Plaintiff Jonathan Settle as Wrongful Death Heir and Personal Representative of the Estate of Judith Hanson, deceased, and lives in Hernando, Mississippi. He is the next of kin and Personal Representative of the Estate of Judith Hanson, a Mississippi Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses from at least 1984 to 2006. On or about November 2012 she was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of her injuries on December 31, 2015.

63.     Plaintiff Anthony Harbin is a resident of Dalton, Georgia. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. On or about 2015 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

64.     Plaintiff William Harman is a resident of Mountain Home, Arizona. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while working as a landscaper from at least 2005 to 2019. On or about August 13, 2020 he was diagnosed with non-Hodgkins Lymphoma. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

65.     Plaintiff Bruce Harr is a resident of Fresno, California. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. He was exposed and/or used Roundup from at least 1999 to 2014. On or about August 2020 he was diagnosed with non-Hodgkins Lymphoma. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

66.     Plaintiff James Harrison is a resident of Orange, Texas. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from at least 1985 to 1994. On or about January 13, 2018 he was diagnosed with non-Hodgkins Lymphoma. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

67.     Plaintiff Karen Harrison as Wrongful Death Heir and Personal Representative of the Estate of Lyndon Harrison, deceased, and lives in Reynoldsburg, Ohio. She is the next of kin and Personal Representative of the Estate of Lyndon Harrison, an Ohio Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. On or about August 25, 2009 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of his injuries on August 31, 2010.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

68.     Plaintiff Brenda Harvey as Wrongful Death Heir and Personal Representative of the Estate of Edward Harvey, deceased, and lives in Columbia, Kentucky. She is the next of kin and Personal Representative of the Estate of Edward Harvey, a Kentucky Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses at his farm. On or about January 2000 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup. On or about January 2010 he was re-diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of his injuries on January 18, 2016.

69.     Plaintiff Lynda Hass is a resident of Bowling Green, Kentucky. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses approximately from May 2001 to September 2018. On or about January 2, 2018 she was diagnosed with non-Hodgkins Lymphoma as a result of Roundup exposure.

70.     Plaintiff Donna Hawes is a resident of Sarasota, Florida. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. She was diagnosed with non-Hodgkins Lymphoma. She developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

71.     Plaintiff Donald Haworth is a resident of Waukomis, Oklahoma. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from at least 1979 to 2019. He was diagnosed with non-Hodgkins Lymphoma on or about April 2019. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

72.     Plaintiff Candace Hee is a resident of Pearl City, Hawaii. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. She was diagnosed with non-Hodgkins Lymphoma on or about February 2007. She developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

73.     Plaintiff Cassandra Devereaux as Wrongful Death Heir and Personal Representative of the Estate of David Henderson Devereaux, deceased, and lives in Waco, Texas. She is the next of kin and Personal Representative of the Estate of David Henderson Devereaux, a Texas Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses from at least 2001 to 2014. On or about January 1, 2014 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of his injuries on November 6, 2016.

74.     Plaintiff William Hernacki is a resident of Byron, Georgia. He was exposed to, purchased and/or used Roundup \and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses approximately from 1992 and 2001. He was diagnosed with non-Hodgkins Lymphoma on or about January 1, 2012. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

75.     Plaintiff Robin Herrera as Wrongful Death Heir and Personal Representative of the Estate of Alfonso Herrera, deceased, and lives in Morristown, Tennessee. She is the next of kin and Personal Representative of the Estate of Alfonso Herrera, a Tennessee Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses from at least 1986 to 1995. On or about

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

January 2018 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of his injuries on March 25, 2020.

76.    Plaintiff Anthony Hicks is a resident of Los Angeles, California. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") while being employed as a maintenance worker. He used and/or was exposed to Roundup in between 2000 to 2020. On or about July 2020 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

77.    Plaintiff Denise Gaffney as Wrongful Death Heir and Personal Representative of the Estate of Nathan Higginbotham, deceased, and lives in Bellmawr, New Jersey. She is the next of kin and Personal Representative of the Estate of Nathan Higginbotham, a New Jersey Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while being employed as a landscaper from at least 2013 to 2016. On or about July 2015 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of his injuries on November 14, 2016.

78.    Plaintiff Ronald Hilker is a resident of Kirbyville, Texas. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses. He used and/or was exposed to Roundup from approximately 2001 to 2012. On or about September 2019 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

79.    Plaintiff Brian Hill is a resident of Dixon, Missouri. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for residential uses from at least between 2000 and 2002. On or about 2014 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

80.     Plaintiff Helen Hines is a resident of Missouri City, Texas. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses. She was exposed to Roundup approximately from 2000 and 2016. She was diagnosed with non-Hodgkins Lymphoma on or about August 24. 2020. She developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

81.     Plaintiff Mick Hogan as Wrongful Death Heir and Personal Representative of the Estate of Todd Hogan, deceased, and lives in West Jordan, Utah. He is the next of kin and Personal Representative of the Estate of Todd Hogan, a Utah Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") while being employed as a Groundskeeper from at least 2007 to June 2017. On or about February 1, 2017 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of his injuries on March 1, 2019.

82.     Plaintiff William Hollyfield is a resident of Toledo, Ohio. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while working as a landscaper and a groundskeeper. He was exposed to Roundup from at least 1980 and 2017. On or about September 14, 2018 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

83.     Plaintiff Lanisha Gambles as Wrongful Death Heir and Personal Representative of the Estate of Tyronne Holmes, deceased, and lives in Lancaster, California. She is the next of kin and Personal Representative of the Estate of Tyronne Holmes, a California Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses from at least 2008 to June 2011. On or about

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

May 1, 2011 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of his injuries on September 12, 2012.

84.     Plaintiff Stella Homicki is a resident of Naperville, Illinois. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from approximately 2003 and 2004. On or about 2006 she was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup.

85.     Plaintiff Diann Horne as Wrongful Death Heir and Personal Representative of the Estate of Josie Horne, deceased, and lives in Montz, California. She is the next of kin and Personal Representative of the Estate of Josie Horne, a California Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal and/or other uses. On or about 1998 he was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of his injuries on March 18, 2008.

86.     Plaintiff Prince Houston is a resident of Scottsdale, Arizona. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while being employed as a maintenance worker. He was exposed to Roundup approximately from 1986 and 2017. On or about 2016 he was diagnosed with non-Hodgkins Lymphoma. He developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

87.     Plaintiff Amanda Huemiller is a resident of Garden City, Idaho. She was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses at her residence from at least 1998 to 2002. On or January 2004 she

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

was diagnosed with non-Hodgkins Lymphoma. She developed non-Hodgkin's Lymphoma as a result of Roundup exposure.

88.     Plaintiff Jorge Huerta Flores is a resident of San Diego, California. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses and while owning and operating a landscaping company. He used and/or was exposed to Roundup from at least 2002 through 2012. He was diagnosed with non-Hodgkins Lymphoma on or about 2017 as a result of exposure to Roundup.

89.     Plaintiff Christopher Humphrey is a resident of West Salem, Ohio. He was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses at his residence and while being employed as a maintenance worker at a cemetery. He used and/or was exposed to Roundup from at least 1969 and 2014. He was diagnosed with non-Hodgkins Lymphoma on or about April 17, 2020 as a result of exposure to Roundup.

90.     Plaintiff Shawn McNea as Wrongful Death Heir and Personal Representative of the Estate of Constance Hundley, deceased, and lives in Liberty, Missouri. She is the next of kin and Personal Representative of the Estate of Constance Hundley, a Missouri Estate. Decedent was exposed to, purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for personal uses from at least 1974 to 2016. On or about January 2010 she was diagnosed with non-Hodgkins Lymphoma as a result of exposure to Roundup and died of her injuries on January 7, 2019.

**Defendant**

91.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

92.     At all times relevant to this petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

## II.    <u>JOINDER AND VENUE</u>

95.     At all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, and packaging and Monsanto was in the business of marketing, promoting, and/or advertising Roundup® products in the State of Missouri and the County of St. Louis.

96.     At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, and therefore is a local defendant for purposes of removal and diversity jurisdiction.

97.     All Plaintiffs herein are properly joined pursuant to Rule 52.05(a) of the Missouri rules of Civil Procedure as their claims all arise out of the same series of transactions or occurrences. All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products as Roundup®, which was conducted without regard to individual Plaintiff differences. All Plaintiffs in this action seek recovery for damages as a result of developing Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma, and/or Leukemia, which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

Myeloma, and/or Leukemia. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup®.

98.    Further, Mo. Rev. Stat. § 508.010.5(1) and § 508.010.9 provide:

5. Notwithstanding any other provision of law, in all actions in which there is a count alleging a tort and in which the plaintiff was first injured outside the state of Missouri, venue shall be determined as follows:

(1) If the defendant is a corporation, then venue shall be in any county where a defendant corporation's registered agent is located or, if the plaintiff's principal place of residence was in the state of Missouri on the date the plaintiff was first injured, then venue may be in the county of the plaintiff's principal place of residence on the date the plaintiff was first injured.

9. In all actions, venue shall be determined as of the date the plaintiff was first injured.

99.    Defendant Monsanto Company's registered agent from 1942 until 2004 was CT Corporation System. From at least 1974 until April 20, 1998, CT Corporation System had its registered office and was located within the City of St. Louis. From at least 1974 until 1988, CT Corporation System was located at 314 North Broadway, St. Louis, Missouri 63102. From 1988 until April of 1998, CT Corporation System was located at 906 Olive Street, St. Louis, Missouri 63101. Thus, from at least 1974 through April 20, 1998, service could only be effectuated in the City of St. Louis.

100.    Venue is further proper in the City of St. Louis pursuant to Mo. Rev. Stat. § 508.010.5(1) and § 508.010.9 because this is a tort case in which many of the Plaintiffs were first injured outside the state of Missouri, and the registered agent for Defendant Monsanto was located in the City of St. Louis at the time of one or more of those Plaintiffs' first exposure to Roundup®.

101.    Plaintiffs have timely filed this lawsuit less than one year from the time the Plaintiffs knew or reasonably knew of the injury and that it may have been wrongfully caused.

III.    **ALLEGATIONS COMMON TO ALL COUNTS**

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

102.    In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

103.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

104.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

105.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

106.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

107.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

108.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

109.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## IV.   **FACTS**

110.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

111.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

112.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

113.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

114.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

115.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

116.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

117.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the States of Missouri.

118.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

119.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

120.   In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup**

121.   Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

122.   On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

123.   In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

124.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

125.     Three top executives of IBT were convicted of fraud in 1983.

126.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

127.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

128.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

129.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

130.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

**Monsanto has known for decades that it falsely advertises the safety of Roundup®.**

131.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)   Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

35

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

132.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. ***

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable ***

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. ***

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

133.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

134.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

**Classifications and Assessments of Glyphosate**

135.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

136.    The established procedure for IARC Monograph evaluations is described in the IARC Programmer's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

137.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

138.    In assessing an agent, the IARC Working Group reviews the following information:

    a)      human, experimental, and mechanistic data;

    b)      all pertinent epidemiological studies and cancer bioassays; and

    c)      representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

139.   In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

140.   On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

141.   The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

142.   Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

143.   Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

144.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

145.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

146.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

147.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

148.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

149.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

150.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

151.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

**Other Earlier Findings About Glyphosate's Dangers to Human Health**

152.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

153.    Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

41

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

154.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

### Recent Worldwide Bans on Roundup®/Glyphosate

155.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

156.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

157.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

158.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

159.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

160.    The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## V.    EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

161.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

162.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

163.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

164.    Indeed, even as of July 2020, Defendant continued to represent to the public that "Glyphosate is one of the most studied herbicides in the world – and, like all crop protection products, it is subject to rigorous testing and oversight by regulatory authorities. There is an extensive body of research on glyphosate and glyphosate-based herbicides, including more than 800 scientific studies submitted to U.S., submitted to U.S. or other worldwide regulators in connection with the registration process, that confirm that glyphosate and our glyphosate-based formulated products can be used safely and do not cause cancer. "

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

(emphasis added).[1] As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

165.    In fact, Defendant has *increased* its advertising of glyphosate-based products in the wake of all of this evidence.[2]  In 2020 alone, Defendant has spent over $8,500,000 to advertise directly to consumers in an attempt to sell them glyphosate-based products.

166.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

167.    Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine

---

[1] Bayer Website Common Questions - Is Glyphosate Safe? at https://www.bayer.com/en/is-glyphosate-safe.aspx (last accessed July 23, 2020).
[2] https://www.wsj.com/articles/roundup-sellers-boost-advertising-as-lawsuits-mount-for-weedkiller-11556738038 (last accessed August 19, 2020).

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## VI.   CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT)
### (AGAINST MONSANTO)

168.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

169.   Plaintiffs bring this strict liability claim against Monsanto for defective design.

170.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiffs, as described above.

171.   At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

172.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

173.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

174.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

175.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

176.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

b)      When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)      When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)      Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e)      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)      At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)      Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h)      Monsanto could have employed safer alternative designs and formulations.

177.    Plaintiffs were exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

178.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

179.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

180.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

181.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

182.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

183.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

184.     The defects in Roundup® products caused or contributed to cause Plaintiffs' grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained their injuries.

185.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

186.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN)
## (AGAINST MONSANTO)

187.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

188.     Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

189.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

190.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

191.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

192.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

193.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

194.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

195.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

196.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

197.    Plaintiffs were exposed to Roundup® products in the course of their employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

198.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

199.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto.

200.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

201.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

202.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

203.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

204.    Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

205.    The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

206.     Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

207.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

**COUNT III**
**NEGLIGENCE**
**(AGAINST MONSANTO)**

208.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

209.     At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

210.     At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use

211.     At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce. In particular, Defendant failed to disclose to the public that

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

Roundup® is unsafe and poses serious health hazards, particularly Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma, and/or Leukemia. Defendant was aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. Defendant's failure to state material facts about Roundup® constitutes a violation of V.A.M.S. § 407.020.

212.    At all relevant times, Plaintiffs were deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

213.    At all relevant times, Plaintiffs acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

214.    As a direct and proximate result of Defendant's unlawful trade practices, Plaintiffs developed Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma, and/or Leukemia, and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

**COUNT IV**
**NEGLIGENCE**
**(AGAINST MONSANTO)**

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

215. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

216. Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

217. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

218. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

219. At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

220. Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

221.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

222.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

223.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

224.    Monsanto was negligent in the following respects:

a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

    c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

    d)    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

    e)    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

    f)    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

    g)    Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

    h)    Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

    i)    Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

j)      Representing that its Roundup® products were safe for their intended use when, in fact,   Monsanto knew or should have known that the products were not safe for their intended purpose;

k)      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l)      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m)      Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n)      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

225.    Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

226.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

227.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

228.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs.

229.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering and have suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT V
### (WRONGFUL DEATH)
### (AGAINST MONSANTO)

230.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

231.    Plaintiffs bring this claim on behalf of and for the benefit of the decedent Plaintiffs, Melinda Day as Wrongful Death Heir and Personal Representative of the Estate of Ernest Evans, Mary Federico as Wrongful Death Heir and Personal Representative of the Estate of Louis Federico, Jana Fitzgerald as Wrongful Death Heir and Personal Representative of the Estate of Mark Fitzgerald, Linda Peevyhouse as Wrongful Death Heir and Personal Representative of the Estate of Jonathon Ford, Janis Frye as Wrongful Death Heir and Personal Representative of the

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

Estate of Richard Wayne Frye Sr., Linda Wright as Wrongful Death Heir and Personal Representative of the Estate of Minnie Gamble, Patricia Giefer as Wrongful Death Heir and Personal Representative of the Estate of Herbert Giefer, Tina Neumann as Wrongful Death Heir and Personal Representative of the Estate of Linda Golden, Angela Lawler as Wrongful Death Heir and Personal Representative of the Estate of Harry Griffin, Hannah Hammond as Wrongful Death Heir and Personal Representative of the Estate of Larry Hammond, Jonathan Settle as Wrongful Death Heir and Personal Representative of the Estate of Judith Hanson, Karen Harrison as Wrongful Death Heir and Personal Representative of the Estate of Lyndon Harrison, Brenda Harvey as Wrongful Death Heir and Personal Representative of the Estate of Edward Harvey, Cassandra Devereaux as Wrongful Death Heir and Personal Representative of the Estate of David Henderson Devereaux, Robin Herrera as Wrongful Death Heir and Personal Representative of the Estate of Alfonso Herrera, Denise Gaffney as Wrongful Death Heir and Personal Representative of the Estate of Nathan Higginbotham, Mick Hogan as Wrongful Death Heir and Personal Representative of the Estate of Todd Hogan, Lanisha Gambles as Wrongful Death Heir and Personal Representative of the Estate of Tyronne Holmes, Diann Horne as Wrongful Death Heir and Personal Representative of the Estate of Josie Horne and Shawn McNea as Wrongful Death Heir and Personal Representative of the Estate of Constance Hundley, (hereinafter referred to as "Decedent Plaintiffs") and their lawful beneficiaries.

232.    As a direct and proximate result of the conduct of the Defendants and the defective nature of Roundup as outlined above, Decedent Plaintiffs suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

233.    As a direct and proximate cause of the conduct of Defendant, Decedent Plaintiffs' beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedent Plaintiffs' death. Decedent Plaintiffs brings this claim on behalf of their lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT VI
### (SURVIVAL ACTION)
### (AGAINST MONSANTO)

234.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

235.    As a direct and proximate result of the conduct of Defendant, where appropriate, Decedent Plaintiffs, prior to their death, were obligated to spend various sums of money to treat their injuries, which debts have been assumed by their Estates. As a direct and proximate cause of the aforesaid, Decedent Plaintiffs endured pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of their deaths; and, as a direct and proximate result of the aforesaid, Decedent Plaintiffs lawful beneficiaries suffered a loss of earnings and earning capacity. Decedent Plaintiffs brings this claim on behalf of their respective estates under applicable state statutory and/or common laws.

236.    As a direct and proximate result of the conduct of Defendant, Decedent Plaintiffs and their spouse and heirs, until the time of their death, suffered a disintegration and deterioration

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

237.    As a direct and proximate result of the aforesaid and including the observance of the suffering and physical deterioration of Decedent Plaintiffs until the date of their death, Decedent Plaintiffs' spouses and heirs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Decedent Plaintiffs' spouses and/or heirs, Personal Representative of their respective estates, brings the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in their own right.

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT VII
## (LOSS OF CONSORTIUM)

238.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as it fully stated herein.

239.    Spouse Plaintiffs, Mary Federico, Jana Fitzgerald, Janis Frye, Patricia Giefer, Hannah Hammond, Karen Harrison, Brenda Harvey, Robin Herrera, Diann Horne, were at all times relevant hereto the spouses of decedents.

240.    For the reasons set forth herein, Spouse Plaintiffs have been caused to suffer from the loss of their spouse's companionship, services and society, and accordingly, the Spouse Plaintiffs have been caused great mental anguish.

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

241.    WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## JURY DEMAND

242.    Plaintiffs hereby demand a trial by jury on all issues so triable.

## DAMAGES

243.    Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

244.    Defendant knew of the dangerous condition of Roundup® products, including that they posed a danger to their consumers and non-consumers exposed to Roundup® products, including Plaintiffs, but chose not to include any warnings or information regarding the dangerous condition of Roundup® products.

245.    Defendant showed complete indifference to or conscious disregard of the safety of Plaintiffs by their conduct described herein. Defendant knew or should have known failure to include a warning for Roundup® products would result in women using and/or being exposed to Roundup® products and subsequently developing Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma, and/or Leukemia.

WHEREFORE, Plaintiffs pray for judgment against Defendant for:

a. compensatory damages in an amount to be proven at trial;

b. costs, including reasonable attorneys' fees, court costs, and other litigation expenses; and

c. any other relief the Court may deem just and proper.

Respectfully submitted,

63

Electronically Filed - City of St. Louis - December 08, 2020 - 11:58 AM

NAPOLI SHKOLNIK, PLLC

*/s/ Christopher L. Schnieders*
Christopher L. Schnieders      MO # 57725
6731 W. 121st Street, Suite 201
Overland Park, KS 66209
Telephone: 913-246-3860
Fax: 913-312-5841
cschnieders@napolilaw.com